Joseph R. Saveri (SBN 130064)
Christopher K. L. Young (SBN 318371)
Itak K. Moradi (SBN 310537)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
imoradi@saverilawfirm.com

Robert L. Lieff (SBN 37568)
P.O. Box A
Rutherford, CA 94573
Telephone: (415) 250-4800
rlieff@lieff.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JONAS PEREZ-HERNANDEZ, ISABEL PAZ-HERNANDEZ, MOISES PEREZ-PAZ, ALLISON PEREZ-PAZ, and ABIGAIL PEREZ-PAZ**, individually and on behalf of all others similarly situated,<br><br>        *Plaintiffs*,<br><br>    v.<br><br>**BAYER AKTIENGESELLSCHAFT**, a German joint-stock company; **BAYER CORPORATION**, an Indiana corporation; and **MONSANTO COMPANY**, a Delaware corporation,<br><br>        *Defendants*. | Case No. 3:23-cv-4946<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE ......................................................................... 3

III.   PARTIES ............................................................................................................. 4

       A.    Plaintiffs ................................................................................................. 4

       B.    Defendants ............................................................................................. 4

IV.    FACTS ................................................................................................................. 6

       A.    Glyphosate and Roundup® Products ................................................... 6

       B.    Monsanto's Development of Roundup® and Its Federal Registration ....................... 7

       C.    The Extensive Evidence of Glyphosate's and Roundup®'s Propensity to Cause NHL and Other Cancers ................................................................. 8

       D.    Monsanto's Decades-Long, Active Concealment of Evidence Glyphosate and Roundup® Are Harmful to Human Health ...........................11

             1.    Monsanto's Successful Derailment of An Early EPA Effort to Classify Glyphosate as a Possible Human Carcinogen ...................................11

             2.    Monsanto's Disregard and Concealment of Warnings from Genotoxicist Dr. James Parry ......................................................11

             3.    Monsanto's Invalid Testing Reports from the Discredited "Industrial Bio-Test Laboratories" .............................................. 13

             4.    Monsanto's Pervasive Ghostwriting Campaign ............................... 13

             5.    Monsanto's Coordinated Campaign Against the IARC's Labeling of Glyphosate as a "Probable Human Carcinogen" ......................... 14

       E.    Monsanto's Decades-Long Continued Advertisement of Roundup® as Safe (Despite Its Knowledge of Its Dangers) ................................................ 17

       F.    The Explosion of Roundup® Usage During Those Same Decades ............................... 17

V.     EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS .................... 18

VI.    CLASS ALLEGATIONS ................................................................................. 19

VII.   CLAIMS FOR RELIEF ................................................................................... 22

PRAYER FOR RELIEF .................................................................................................. 45

VIII.  JURY DEMAND .............................................................................................. 45

Plaintiffs Jonas Perez-Hernandez, Isabel Paz-Hernandez, Moises Perez-Paz, Allison Perez-Paz, and Abigail Perez-Paz ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through undersigned class counsel, allege as follows:

## I.    **INTRODUCTION**

1.      Defendants Bayer AG and Bayer Corp. (together, "Bayer") market their multinational corporate conglomerate with the trademarked slogan, "*Science for a **better life***."™ But for many tens of millions of people residing in the United States, Bayer valued its bottom-line over their lives when it purchased Monsanto Company, the manufacturer of Roundup®, an herbicide known to cause Non-Hodgkins Lymphoma ("NHL"), a deadly blood cancer, and continued to sell this dangerous (but highly profitable) product throughout the United States and the world.

2.      In doing so, Bayer is continuing Monsanto's decades-long history of putting agricultural workers, landscapers, and home gardeners at risk of developing NHL and other devastating diseases while actively concealing the known health risks of the world's most-used herbicide.

3.      When Bayer closed the biggest acquisition in its history by purchasing Monsanto for $63 billion in June 2018, it paid a substantial premium for the company, despite the fact that Monsanto was defending thousands of lawsuits alleging that its flagship product, Roundup®, had caused the plaintiffs to develop NHL and other serious diseases. Having boasted of its thorough due diligence in acquiring Monsanto, Bayer cannot claim ignorance of Monsanto's extensive history of manipulating scientific literature on the carcinogenicity of glyphosate and Roundup® to conceal their risks from the public and regulators. But rather than reformulate Roundup® (which it is capable of doing) for all users, Bayer finally decided to phase out its glyphosate-based Roundup® product in 2023, but *only* in the residential lawn and garden market, which it describes as a "relatively small or very small part of the Roundup™ business" but the source of "over 90% of all claims" filed against Monsanto. As a result, Bayer continues to put agricultural workers and landscapers at risk of developing a deadly blood cancer simply because they have historically proven less litigious.

4.      Perversely, and given its unique posture as an international conglomerate, Bayer stands to profit handsomely from its decision to continue exposing agricultural workers and landscapers to

glyphosate-based Roundup®. In addition to the revenues it will reap from its continued massive sales of both glyphosate-based Roundup® and Roundup Ready® seeds for glyphosate-resistant crops in non-residential markets, Bayer now sells and/or is developing for sale several medications for treatment of NHL and other diseases associated with Roundup®, including Aliqopa™ ($12,600 per 28-day treatment cycle) and therapies for the treatment of Parkinson's Disease. Pharmaceuticals is Bayer's second largest division, behind only Crop Science (the division encompassing Monsanto's business), and "Bayer is counting on its growing oncology business to deliver one third of the $30 billion in pharmaceuticals sales it has committed to generating by 2030."

5.      Like Monsanto before it, Bayer maintains to the public and government regulators that Roundup® is safe and, specifically, that "[t]here is an extensive body of research on glyphosate and glyphosate-based herbicides, including more than 800 scientific studies submitted to U.S. or other worldwide regulators in connection with the registration process, that confirm that glyphosate and our glyphosate-based formulated products can be used safely and do not cause cancer." In fact, and as Bayer is well aware, many such studies have been discredited as ghostwritten by Monsanto or deemed otherwise invalid. Yet Bayer continues to cite studies discredited studies and continues to rely on an EPA evaluation of the carcinogenicity of glyphosate that the United States Court of Appeals for the Ninth Circuit has vacated for including "serious" errors in "assessing human-health risk."

6.      Defendants knew or should have known that Roundup® is carcinogenic and associated with an increased risk of developing NHL. Yet Defendants took active steps to conceal and failed to adequately inform and warn Plaintiffs and the Class of the serious risks associated with the use of and exposure to glyphosate-based formulations and/or Roundup®. In the pursuit of massive profit and at the expense of public health, Defendants have promoted and funded falsified data; attacked legitimate studies revealing the dangers of Roundup®;mounted a campaign of misinformation to delegitimize the work of scientists attempting to reveal the dangers of Roundup®; and made and continue to make representations suggesting that Roundup® was, and is, safer than ordinary household items (including, even, table salt). These statements and misrepresentations have been made with the intent of inducing the purchase and use of Roundup® for Defendants' pecuniary gain, and with disregard for and reckless indifference to the safety of those exposed to Roundup®.

7.     As a result of Monsanto's decades-long scientific fraud and obfuscation, well over one hundred thousand Roundup® users have already been diagnosed with NHL and other serious health conditions. NHL is a deadly blood cancer that affects the body's lymph system, which fights infection and disease. The cancer often spreads to other areas of the body, including the liver, brain, and bone marrow. One in four people diagnosed with NHL die within five years. Survivors of NHL suffer from a diminished quality of life due to treatment-related toxicities, lasting physical pain, fatigue, financial difficulties, post-traumatic stress, and fear of relapse.

8.     As of 2022, Bayer had resolved approximately 75% of 125,000 claims that were filed or set to be filed for $10 billion. Those settlements do nothing to help the millions of other people exposed to Roundup® who face an increased risk of developing NHL, and the hundreds of thousands or more of those people who will ultimately develop this devastating disease.

9.     This lawsuit seeks to obtain compensatory damagess, medical monitoring, and other valuable relief on behalf of Plaintiffs and the hundreds of thousands agricultural workers, landscapers, and home gardeners who used Roundup®, unaware this exposure increased their risk of contracting NHL. It also seeks punitive damages in an amount sufficient to punish Defendants for their callous indifference to the health and safety of Plaintiffs and the Class.

## II.    <u>JURISDICTION AND VENUE</u>

10.     This Court has subject matter jurisdiction over Defendants and the proposed class action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act. CAFA grants federal courts original jurisdiction over any class action in which the proposed class has at least 100 members, there are members of the proposed class that are diverse from Defendants, and the matter in controversy exceeds $5 million exclusive of interest and costs. Plaintiffs, as Class members, are citizens of the state of California. Defendants are incorporated and operate their principal places of business outside of the State of California, where Plaintiffs reside, and on information and belief, the amount in controversy exceeds $5 million.

11.     This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy as the claims within the Court's original jurisdiction.

12.     This Court has personal jurisdiction over Defendants because the conduct at issue arises out of Defendants' contacts with this District. Defendant has, at all times relevant, individually or through its agents, subsidiaries, and representatives engaged in business in this State; marketed, advertising, distributed, and/or sold products in this State; committed statutory violations related to the allegations set forth herein in this State; and caused injuries to Plaintiffs and the proposed Class that arose out of acts and omissions that occurred in in this State.

13.     Venue is proper within this district pursuant to 28 U.S.C. § 1391. Defendants, through their business conduct, purposefully avail themselves of the markets in this District and have sufficient minimum contacts with this District, and a substantial part of the acts and/or omissions giving rise to these claims occurred in this State.

## III.    <u>PARTIES</u>

### A.    <u>Plaintiffs</u>

14.     Plaintiff Jonas Perez-Hernandez was and is a resident of the State of California. Plaintiff was exposed to Roundup® products over a period of approximately 19 years in San Luis Obispo, California.

15.     Plaintiff Isabele Paz-Hernandez was and is a resident of the State of California. Plaintiff was exposed to Roundup® products over a period of approximately 19 years in San Luis Obispo, California.

16.     Plaintiff Moises Perez-Paz was and is a resident of the State of California. Plaintiff was exposed to Roundup® products over a period of approximately 18 years in San Luis Obispo, California.

17.     Plaintiff Allison Perez-Paz was and is a resident of the State of California. Plaintiff was exposed to Roundup® products over a period of approximately 13 years in San Luis Obispo, California.

18.     Plaintiff Abigail Perez-Paz was and is a resident of the State of California. Plaintiff was exposed to Roundup® products over a period of approximately nine years in San Luis Obispo, California.

### B.    <u>Defendants</u>

19.     Bayer Aktiengesellschaft ("Bayer AG") is a joint-stock company incorporated in the Federal Republic of Germany with its headquarters and principal place of business at Bayerwerk,

Gebäude W11, Kaiser-Wilhelm-Allee, 51368 Leverkusen, Germany. On June 7, 2018, Bayer became the sole owner of Defendant Monsanto in the largest acquisition in Bayer's history for a total purchase price of $63 billion. <u>Bayer took out $57 billion in financing to make the acquisition and remains $43 billion in debt as a result.</u> Since acquiring Monsanto, Bayer AG, along with its US subsidiary, has persisted in designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup® despite knowing that Roundup® is unsafe and causes NHL and other dangerous cancers.

20.     Bayer Corporation ("Bayer US") is an Indiana corporation, with its headquarters and principal place of business in Whippany, New Jersey. Bayer US is a wholly owned subsidiary of Bayer AG and the direct parent of Defendant Monsanto.

21.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation, with its headquarters and principal place of business in St. Louis, Missouri. At all times relevant to this Complaint, Monsanto was the entity that discovered and promoted the herbicidal properties of glyphosate and is engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling Roundup®. Since June 7, 2018, Monsanto has been wholly owned, indirectly, by Bayer AG.

22.     "Roundup®" refers to all formulations of Defendants' Roundup® products, including, but not limited to, Roundup® Concentrate Poison Ivy and Tough Brush Killer 1, Roundup® Custom Herbicide, Roundup® D-Pak Herbicide, Roundup® Dry Concentrate, Roundup® Export Herbicide, Roundup® Fence & Hard Edger 1, Roundup® Garden Foam Weed & Grass Killer, Roundup® Grass and Weed Killer, Roundup® Herbicide, Roundup® Original 2k Herbicide, Roundup® Original II Herbicide, Roundup® Pro Concentrate, Roundup® Prodry Herbicide, Roundup® Promax, Roundup® Quik Stik Grass and Weed Killer, Roundup® Quikpro Herbicide, Roundup® Rainfast Concentrate Weed & Grass Killer, Roundup® Rainfast Super Concentrate Weed & Grass Killer, Roundup® Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup® Ready- to-Use Weed & Grass Killer, Roundup® Ready-to-Use Weed and Grass Killer 2, Roundup® Ultra Dry, Roundup® Ultra Herbicide, Roundup® Ultramax, Roundup® VM Herbicide, Roundup® Weed & Grass Killer Concentrate, Roundup® Weed & Grass Killer Concentrate Plus, Roundup® Weed & Grass Killer Ready-to-Use Plus, Roundup® Weed &

Grass Killer Super Concentrate, Roundup® Weed & Grass Killer 1 Ready-to-Use, Roundup® WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, and any other formulation containing the active ingredient glyphosate.

23.    Defendants derive substantial revenue from goods and products used in California and nationwide. Defendants expected or should have expected their acts to have consequences within this District and California, as well as nationwide. Upon information and belief, Defendants did design, sell, advertise, manufacture and/or distribute Roundup® with full knowledge of its dangerous and defective nature.

## IV.    FACTS

### A.    Glyphosate and Roundup® Products

24.    Glyphosate is a broad-spectrum herbicide used to kill unwanted weeds and grasses around the world. It is a "non-selective" herbicide, meaning it is toxic to any plant that produces a specific enzyme, 5-enolpyruvylshikimic acid-3-phosphate synthase, known as "EPSP synthase." This enzyme interferes with the accumulation in plants of shikimic acid, an important biochemical metabolite. By inhibiting this enzyme, glyphosate causes an accumulation of shikimic acid in plant tissue and ultimately plant death.

25.    Today, glyphosate is the most-used herbicide in the world. Each year, approximately 127,000 tons (or 254 million pounds) of glyphosate-based products are sprayed on crops, school campuses, commercial nurseries, lawns, parks, and golf courses in the United States alone; approximately 700,000 tons of glyphosate-based products are sprayed on such areas worldwide. Much of the commercial use has been driven by the development of "Roundup Ready®" seeds which are resistant to glyphosate, permitting users to target unwanted weeds and grasses without harming desirable plants grown from these seeds.

26.    At all relevant times, Monsanto—now owned by Bayer—designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup®, a glyphosate-based herbicide.

**B.**     **Monsanto's Development of Roundup® and Its Federal Registration**

27.     Monsanto began its research, manufacture, and distribution of glyphosate-based herbicide "Roundup®" in the 1970s. The original Roundup® product was introduced in 1974.

28.     Roundup® is a mixture of multiple chemicals. In addition to glyphosate, it includes surfactants, which are chemicals that increase penetration of other chemicals (in this case, glyphosate) into both plant and human tissue.

29.     The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, *et seq*. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA, 7 U.S.C. § 136a(a).

30.     As part of the registration process, the EPA requires a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA is not an assurance or finding of safety. Rather, the determination the EPA makes in registering or re-registering a product is not that the product is "safe," but that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment."

31.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, considering the economic, social, and environmental costs and benefits of the use of any pesticide." FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

32.     FIFRA generally requires that the registrant conduct health and safety testing of pesticide products. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform product testing required of the manufacturer. The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.

33.     In 1974, to obtain initial registration and approval to sell Roundup® in the United States from the EPA, Monsanto submitted results of studies examining the effects of glyphosate on animals,

including animal cancer studies. These studies were subsequently deemed invalid, but not before this carcinogenic product was released into the marketplace.

34.     The data necessary for registration of a pesticide has changed over time. Accordingly, the EPA has been re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." In order to re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for review and evaluation.

35.     In the case of glyphosate and Roundup®, the EPA had planned on releasing its preliminary risk assessment—in relation to the re-registration process—by July 2015. On March 24, 2015, however, the United Nations' World Health Organization's ("WHO") International Agency for Research on Cancer ("IARC") identified glyphosate as "probably carcinogenic to humans." Although the EPA completed its review of glyphosate in early 2015, it delayed releasing the assessment pending further review in light of the IARC's finding. On January 30, 2020, the EPA released its re-registration decision on glyphosate, which concluded that "there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." As explained below, however, this conclusion was based on a body of scientific literature that has been manipulated by Defendants for decades.

36.     Indeed, the United States Court of Appeals for the Ninth Circuit has ordered the EPA to reconsider its decision regarding glyphosate after reviewing the science and determining EPA had "shirked its duties" in reviewing glyphosate. The Court found that "EPA's errors in assessing human-health risk are serious" and noted that the EPA deemed glyphosate unlikely to cause cancer despite the fact that most studies it reviewed showed glyphosate caused an increased risk of NHL.

## C.     The Extensive Evidence of Glyphosate's and Roundup®'s Propensity to Cause NHL and Other Cancers

37.     As early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties, alone and as formulated in glyphosate-based herbicides like Roundup®.

38.     Glyphosate and Roundup® have long been associated by scientists and researchers with carcinogenicity and the development of NHL.

39.    Numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup®, including but not limited to:

- A 1983 study that revealed that mice exposed to glyphosate developed malignant lymphomas and rare kidney tumors at increased rates;

- A 1995 study by the EPA on the effects of glyphosate on mice that found a dose-related response in male mice linked to renal tubal adenomas, a rare tumor and concluded that glyphosate was oncogenic;

- A 1998 study that found exposure to glyphosate increases the risk of hairy cell leukemia, an NHL subtype, by 300%;

- A 1999 study that found that using glyphosate even once ("ever-use") increases a person's risk of NHL by 230%;

- A 2001 study that found that exposure to glyphosate twice in one year increases a person's odds of NHL by 212%;

- Two case-controlled studies published in 2002 that concluded glyphosate had the most significant relationship to NHL among all herbicides, with an increased odds ratio of 3:11;

- A 2003 study that concluded from pooled data that use of glyphosate increased incidence of NHL;

- A 2008 study that found a 200% risk increase in NHL with exposure to glyphosate, with risk increasing 236% by people using glyphosate more than 10 days in one year;

- A 2013 study that found use of glyphosate more than twice in one year was associated with a 200% increase in multiple myeloma (an NHL sub-type);

- Another 2013 study that found exposure to glyphosate increased risk of B-cell lymphoma by 310%; and

- A 2023 study that found a correlation between glyphosate exposure and the presence of biomarkers of genotoxicity in the exposed person's urine.

40.    The State of California considers glyphosate a carcinogen.

41.    Further, as noted above, in 2015, the IARC, a specialized intergovernmental cancer research agency that is part of the United Nations' WHO, designated glyphosate a probable human

carcinogen. In 2014, the IARC decided to review glyphosate, a finding that required both existing evidence of carcinogenicity and human exposure. The IARC set glyphosate for review in 2015-2016. The IARC sources the data it reviews from publicly accessible, peer-reviewed data. On March 24, 2015, after a year-long, cumulative review of human, animal, and DNA studies, the IARC's Working Group published its conclusion that the glyphosate contained in Roundup® herbicide is a Group 2A, "Probable Human Carcinogen," as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals. The IARC's full Monograph was published on July 29, 2015. The IARC found an increased risk between exposure to glyphosate and NHL, as well as several subtypes of NHL, and found that the increased risk continued after adjustment for other pesticides. It also found that glyphosate caused DNA and chromosomal damage in human cells.

42. Beyond glyphosate itself being carcinogenic, there is substantial evidence dating back to at least 1991 that the surfactants in formulated glyphosate-based herbicides such as Roundup® substantially increase toxicity and danger to human health by enhancing the absorption of glyphosate through human skin. These studies include findings that the children of pesticide applicators experience higher rates of childhood cancer, that glyphosate itself is carcinogenic causes NHL, and that Roundup® is even more toxic than its active ingredient glyphosate alone.

43. The results of these studies were confirmed in published peer-reviewed studies and were always available and/or known to Defendants. Indeed, Defendant Monsanto claimed to review in detail "every" study published about their products and that it takes every such study "seriously."

44. Although scientists are confident that Roundup® and other glyphosate-based herbicides are more toxic and carcinogenic than glyphosate alone, their inquiry is limited by Defendants' refusal to release the full list of chemicals in Roundup®'s formula.

45. Defendants knew or should have known that glyphosate is carcinogenic and that Roundup® is more toxic than glyphosate alone, and that safety studies on Roundup® and the formulated product (including surfactants) were necessary to protect Plaintiffs and members of the Class from potential injury from Roundup®.

D.    **Monsanto's Decades-Long, Active Concealment of Evidence Glyphosate and Roundup® Are Harmful to Human Health**

46.    Rather than meaningfully investigate the safety of Roundup® as formulated or warn consumers about the risks glyphosate posed, Monsanto continued to sell Roundup® to millions of consumers each year and dedicated itself to undermining the scientific community's efforts to establish conclusively the health risks posed by Roundup®. Indeed, as one court has already found by clear and convincing evidence, "Monsanto made 'continuous efforts to impede, discourage, or distort the scientific inquiry about glyphosate and those actions were reprehensible and showed a conscious disregard for health.'"

1.    **Monsanto's Successful Derailment of An Early EPA Effort to Classify Glyphosate as a Possible Human Carcinogen**

47.    For example, after a 1983 study showed increased incidence of kidney tumors in mice exposed to glyphosate, the EPA planned to classify glyphosate as a possible human carcinogen. After learning that the only way to prevent this classification was to submit a new (contrary) study or establish there were kidney tumors in the control groups, Monsanto hired a pathologist to "persuade the agency that the observed tumors are not related to glyphosate"; as requested, the pathologist found a tumor in the control group that he promptly brought to the EPA's attention. Although the EPA disagreed with that finding, it requested that Monsanto perform a special new mouse study designed by the EPA and Monsanto scientists "to increase the statistical power of the results." Monsanto never conducted that study. Later, studies in mice like the one Monsanto failed to conduct found malignant lymphoma in mice exposed to glyphosate.

2.    **Monsanto's Disregard and Concealment of Warnings from Genotoxicist Dr. James Parry**

48.    As another example, in the late 1990s, Monsanto hired Dr. James Parry, a scientist specializing in genotoxicity (*i.e.*, the ability of a chemical compound to cause damage to genetic information at the cellular level, resulting in the mutations that cause cancer), to create reports to help Monsanto convince both the scientific community and consumers that glyphosate was safe.

49.     But Dr. Parry's review of the scientific evidence did not support Monsanto's desired conclusion. Dr. Parry reported to Monsanto that glyphosate appeared to be genotoxic and that Roundup®, as formulated, was even more genotoxic than glyphosate alone. Dr. Parry further alerted Monsanto that prior studies it performed were subject to "a number of deficiencies" and recommended additional studies.

50.     Rather than address Dr. Parry's concerns, Monsanto executives concluded that they should find a more pliable genotoxicist, as Dr. Parry's report confirmed it would "take quite some time and $$$/studies" to make Dr. Parry "comfortable with the genetox profile of glyphosate/Roundup." Specifically, Dr. William Heydens, Monsanto's "Product Safety Assessment Strategy Lead" wrote in a September 16, 1999 email (highlighting added):

| | |
|---|---|
| From: | HEYDENS, WILLIAM F [FND/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=230737] |
| Sent: | 9/16/1999 6:18:36 PM |
| To: | MARTENS, MARK A [FND/5045] [/O=MONSANTO/OU=EA-5040-01/CN=RECIPIENTS/CN=21606]; 'KIER, LARRY D [NCP/1000]' [/O=MONSANTO/OU=GLB-STL/CN=LEGACY ADDRESSES/CN=33322]; 'FARMER, DONNA R [FND/1000]' [/O=MONSANTO/OU=GLB-STL/CN=LEGACY ADDRESSES/CN=180070] |
| CC: | 'HEYDENS, WILLIAM F [FND/1000]' [/O=MONSANTO/OU=GLB-STL/CN=LEGACY ADDRESSES/CN=230737] |
| Subject: | RE: Parry report |

Mark, All,

I have read the report and agree with the comments - there are various things that can be done to improve the report.

However, let's step back and look at what we are really trying to achieve here. We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox. issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. We simply aren't going to do the studies Parry suggests. Mark, do you think Parry can become a strong advocate without doing this work Parry? If not, we should *seriously* start looking for one or more other individuals to work with. Even if we think we can eventually bring Parry around closer to where we need him, we should be currently looking for a second/back-up genetox. supporter. We have not made much progress and are currently very vulnerable in this area. We have time to fix that, but only if we make this a high priority now.

Bill

51.     Dr. Donna Farmer, a senior Monsanto toxicologist, similarly expressed that Dr. Parry's findings put Monsanto in a "genotoxic hole," and suggested they bring in "the good Dr. Kier," a retired Monsanto genotoxicist on Monsanto's payroll as a consultant, to "interface" with Parry.

52.     Monsanto failed to perform some of the studies Dr. Parry recommended. It also failed to report Dr. Parry's findings to the EPA, in violation of federal law.[1]

### 3. Monsanto's Invalid Testing Reports from the Discredited "Industrial Bio-Test Laboratories"

53.     While Monsanto has attempted to cast its disregard of Dr. Parry's findings as a mere disagreement of reasonable scientific minds, in reality, Monsanto's safety claims were built on studies that were invalid, if not criminally fraudulent. Many of the studies Monsanto commissioned and relied on to suggest glyphosate and Roundup® were safe were actually performed by a laboratory that was later discredited after an EPA audit revealed scientific fraud and falsified research data—which resulted in the federal convictions of three IBT Labs executives in 1983.

54.     An EPA audit subsequently found toxicology studies that Monsanto procured from IBT to obtain EPA approval for Roundup® were invalid. Monsanto did nothing to warn the public that its safety testing had been invalidated and continued to market Roundup® in the same manner.

### 4. Monsanto's Pervasive Ghostwriting Campaign

55.     Numerous other studies touted by Monsanto as supporting the safety of glyphosate and Roundup® were ghostwritten by Monsanto employees.

56.     For example, in one internal Monsanto email from 2015, Dr. Heydens acknowledged that Monsanto had ghostwritten a 2000 study signed by Williams, Kroes & Munro. This "study"—penned by Monsanto—purported to "undertake to produce a current and comprehensive safety evaluation and risk assessment [of glyphosate and Roundup®] for humans" and unsurprisingly concluded that "under present and expected conditions of use, Roundup herbicide does not pose a health risk to humans."

57.     In the same email, Dr. Heydens suggested that Monsanto ghostwrite another article as part of Monsanto's planned response to undermine the World Health Organization's International Agency for Research on Cancer's ("IARC") then-imminent announcement that glyphosate was "probably carcinogenic to humans." Specifically, Dr. Heydens suggested that, as with the 2000 Williams, Kroes & Munro study, Monsanto add non-Monsanto scientists to a study "to have their names on the publication"

---

[1]  *Pilliod*, 67 Cal. App. 5th at 644-45 & n.33.

while "keeping the cost down by us [Monsanto] doing the writing and [the non-Monsanto scientists] would just edit and sign their names. "Although Williams and Heydens would later dispute Mr. Heydens' description of how that prolifically-cited article was created, when it was published in 2000, Monsanto's Lisa Drake congratulated several Monsanto employees for their "data collection as well as writing, review and relationship building with" the authors and suggested the paper be used to "build Roundup sales."

58.     In another internal Monsanto email, Dr. Farmer acknowledged a host of additional published papers that were in fact commissioned by Monsanto; in each case, Monsanto contracted with the author to "write a review of studies and get them published"; the authors "did not conduct any studies" themselves. Rather, as Dr. Farmer explained: "The only people conducting studies are us the registrants [Monsanto] or the Seralini's, Carrascos, etc. and their take is it is not 'safe.'" Thus, Dr. Farmer cautioned: "We cannot say [glyphosate] is 'safe'…we can say history of safe use, used safely, etc."

59.     Further evidencing the culture of ghostwriting entrenched at Monsanto, in 2013, Monsanto employee Dr. David Saltmiras sought public recognition for his authorship of a forthcoming publication that would be attributed to Dr. Larry Kier and Dr. David Kirkland, complaining he had recently written five manuscripts regarding glyphosate for Monsanto without being listed as an author. Although Dr. Kier acknowledged co-authorship was appropriate, Dr. Kirkland rejected Dr. Saltmiras' request because if he was listed "the authors would no longer be 'independent,'" affecting "journal acceptability." Notably, the EPA relied extensively on the 2013 Kier and Kirkland study in finding in 2016 that glyphosate was "not likely to be carcinogenic to humans," a finding which was controversial even within the EPA, of course unaware that the study was also authored by a Monsanto employee.

### 5.    Monsanto's Coordinated Campaign Against the IARC's Labeling of Glyphosate as a "Probable Human Carcinogen"

60.     When Monsanto learned as early as 2014 that the IARC was critically reviewing glyphosate as a probable human carcinogen, Monsanto doubled down on its ghostwriting and other unethical practices to seize control of the public narrative, flood the scientific literature with positive reports of glyphosate's safety, and smear the IARC.

61.     Monsanto understood that the IARC's review posed a major threat to its ability to continue selling Roundup®. As Dr. Heydens wrote in an internal Monsanto email: "If there is a force working against glyphosate, there is ample fodder to string together to help the case even though it is not scientifically justified *in its purest form*." In other words, Heydens understood that there was plenty of scientific evidence available to support a finding of human carcinogenicity, absent application of the kind of hyper-technical arguments Monsanto and its army of researchers on payroll were willing to make to discount it.

62.     Doubling down on its ghostwriting efforts, Monsanto hired a Canadian firm, Intertek, to coordinate four "independent expert panels" of fifteen researchers to publish five studies in a journal called *Critical Reviews in Toxicology* in 2016, as part of Monsanto's efforts to battle IARC's announcement. The researchers concluded unanimously that glyphosate was not a carcinogen. Those papers proved persuasive to regulators. For example, in defending its decision to re-approve use of glyphosate in 2017 until 2032, despite the IARC's 2016 warning, Health Canada cited the papers generated by the researchers coordinated by Intertek, which were bought and paid for by Monsanto. A 2016 EPA panel charged with reviewing the safety of glyphosate also recommended that the EPA study "relevant papers," including two of the papers generated as part of the Intertek project.

63.     All the authors associated with the Intertek project ultimately signed "corrections," disclosing belatedly that Monsanto reviewed preliminary and final drafts of their articles criticized the IARC assessment. They also disclosed in a 2018 edition of the *Critical Reviews in Toxicology* that they had failed to disclose that Monsanto provided a "regulatory history overview" that was not disclosed, and they apologized for any "errors or omissions."

64.     Still, Monsanto's strategy of ghostwriting and paying off scientists to flood the literature with reports that glyphosate was successful. In addition to Kier and Kirkland (2013), *see* paragraph 58, and the Intertek papers, the EPA also cited other "studies" by Monsanto collaborators, including a 2015 study and a 2020 study later identified as ghostwritten.

65.     Monsanto also quietly funded lobbying groups to undermine public statements calling into question the safety of glyphosate or Roundup®. For example, in 2017, a group called "Campaign for Accuracy in Public Health Research" ("CAPHR") formed with the purpose of discrediting the IARC's

determination that glyphosate was a probable human carcinogen. CAPHR was funded by CropLife America, which was in turn funded by Monsanto. CAPHR lobbied Congress to defund the IARC in response to its determination.

66.    Monsanto emails also reveal that Monsanto quietly funded the American Council on Science and Health ("ACSH") in exchange for the group promoting glyphosate and deriding its critics under the guise of an "independent" group of scientists.

67.    In an internal Monsanto email, Monsanto employee Daniel Goldstein candidly explained that Monsanto had few supporters and that Monsanto "WILL NOT GET A BETTER VALUE FOR [ITS] DOLLAR than ACSH":

Message

| | |
|---|---|
| From: | GOLDSTEIN, DANIEL A [AG/1000] [/O=MONSANTO/OU=NA-1000-01/CN=RECIPIENTS/CN=527246] |
| Sent: | 2/26/2015 8:08:31 PM |
| To: | VICINI, JOHN L [AG/1000] [/O=MONSANTO/OU=Na-1000-01/cn=Recipients/cn=56908]; REYNOLDS, TRACEY L [AG/1000] [/O=MONSANTO/OU=Na-1000-01/cn=recipients/cn=133378] |
| CC: | SACHS, ERIC S [AG/1000] [/O=MONSANTO/OU=NA-1000-01/cn=Recipients/cn=171736] |
| Subject: | ACSH |

While I would love to have more friends and more choices, we don't have a lot of supporters and can't afford to lose the few we have....

I am well aware of the challenges with ACSH and know Eric has valid concerns- so I can assure you I am not all starry-eyed about ACSH- they have PLENTY of warts- but:

You WILL NOT GET A BETTER VALUE FOR YOUR DOLLAR than ACSH:

They are working with us to respond if needed to IARC- Gil has asked for information feed.

68.    Monsanto also undertook a smear campaign against the IARC almost as soon as it knew glyphosate was being reviewed, anticipating the IARC would label glyphosate carcinogenic. For example, Monsanto created an internal document on "strategies and tactics" for responding to the IARC. One such tactic was "Orchestrate Outcry with IARC Decision."

69.     Monsanto leaned on ASCH, their bought-and-paid-for lobbying group of purportedly independent scientists, for this effort. Among other things, ACSH coined the term "Glyphosate-gate" in their efforts to discredit the IARC.

70.     Bayer has continued Monsanto's campaign against the IARC, inaccurately critiquing the IARC's conclusion as "inconsistent" with experts.

E.     **Monsanto's Decades-Long Continued Advertisement of Roundup® as Safe (Despite Its Knowledge of Its Dangers)**

71.     Despite Monsanto's knowledge of extensive evidence of the dangers of glyphosate and Roundup®, Roundup® products did not contain a warning label telling consumers to use protective equipment or notifying them of the cancer risks of exposure. Rather, the product label inaccurately informed consumers that Roundup® "targets an enzyme found in plants, but not in people or pets."

72.     For years, Monsanto produced commercials that depicted people using Roundup® without protective equipment.

73.     Monsanto even implicitly supported a narrative that Roundup® is safe enough to drink.

74.     At the same time, Monsanto was warning its own employees who worked with Roundup® to wear protective bodysuits, gloves and face masks.

F.     **The Explosion of Roundup® Usage During Those Same Decades**

75.     For more than 40 years, consumers, and farmers have used Roundup®. During that time, Roundup® and Monsanto's other related brands grew to be top sellers based on their products' efficacy and unearned reputation for safety. Glyphosate is now the most-used herbicide in the world.

76.     Many consumers report choosing Roundup® because they believed it was safe.

77.     Those same consumers often used the product without any protective equipment because Monsanto did not instruct them to do so and instead portrayed consumers applying in shorts and without gloves.

78.     Roundup®'s status as a market leader and perennial cash cow was solidified with the development of genetically-modified seeds, and particularly so-called Roundup Ready® seeds for agricultural crops that are immune to Roundup®, allowing commercial farmers to use much more Roundup® because it could be applied directly to crops without damaging them.

79.     As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready®. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States contained Roundup Ready® seeds.

80.     Defendants were able to secure their dominant market position in the glyphosate and herbicide market through a marketing strategy that coupled proprietary Roundup Ready® seeds with continued sales of the Roundup® herbicide.

81.     The success of Roundup®, Roundup Ready® seeds, and related products has made glyphosate omnipresent in the United States.

82.     In the United States, people's exposure to glyphosate increased by 500% after Monsanto introduced its Roundup® Ready seeds in 1996.  Today, 80% of urine samples among U.S. children and adults contain glyphosate.

## V.    EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

83.     The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment of risks of glyphosate and Roundup™. Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiffs and Class members the true risks associated with Roundup® and glyphosate.

84.     At all relevant times, Defendants have maintained that Roundup® is safe, non-toxic, and non-carcinogenic.

85.     As of March 2023, Bayer continues to represent to the public that "There is an extensive body of research on glyphosate and Bayer's glyphosate-based herbicide . . . that confirms these products can be used safely and that glyphosate does not cause cancer."

86.     Even after a jury found in 2019 that "Roundup's design was defective," "Roundup lacked sufficient warning of the risk of NHL," and "Monsanto was negligent by not using reasonable care to warn about Roundup's NHL risk," Defendants continue to make false and misleading assertions regarding the safety of Roundup®, including that the product "can be used safely and . . . glyphosate does not cause cancer."

87.     As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonably know or have learned through reasonable diligence, that contact with Roundup® and/or glyphosate

exposed Plaintiffs to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

88.     Because of their fraudulent concealment of the true character, quality, and nature of Roundup®, Defendants are estopped from relying on any statute of limitations. Defendants were under a duty to disclose the true character, quality, and nature of Roundup® because this was non-public information over which Defendants had and continue to have exclusive control, and because Defendants knew that this information was not available to Plaintiffs or to distributors of Roundup®. Defendants are also estopped from relying on any statute of limitations because of its intentional concealment of these facts.

89.     Plaintiffs did not know that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Additionally, Defendants had the ability to and did spend enormous amounts of money in furtherance of marketing, promoting and/or distributing a profitable herbicide, notwithstanding the known, reasonably knowable risks. Plaintiffs and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks, and were forced to rely on Defendants' false representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.     CLASS ALLEGATIONS

90.     Plaintiffs bring this action as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

91.     Plaintiffs bring this action on behalf of a class defined as: "those individuals who are either citizens or residents of the United States as of September 26, 2023 or who claim exposure to Roundup® Products through the application of Roundup® Products in the United States and who both (1) have been exposed to Roundup® Products twice in the same year through the application of Roundup® Products prior to September 26, 2023, and (2) have not commenced an individual, non-class lawsuit or retained counsel for the pursuit of any individual, non-class personal injury, or false advertising claims arising from or relating to such exposure prior to September 26, 2023.

92.     All members of the Class are similarly affected by the misrepresentations and concealments related to the funding of research, marketing, labeling, and sale of Roundup® Products. Plaintiffs thus bring this action on behalf of the entire Class for (1) monetary damages and compensation, including an appropriate court-supervised program for compensation for Class members who may claim injury resulting from NHL exposure.   and (2) equitable and injunctive relief for a court-supervised medical monitoring program as described in Count XI of this Complaint. Alternatively, Plaintiffs seek to certify important common questions for class-wide determination for the Class on an "issues class" basis.

93.     **Numerosity**. Roundup® is the best-selling herbicide in the United States. The members of the Class are so numerous as to render their individual joinder impracticable. Although the precise number of Class members is unknown, based upon information and belief, Plaintiffs allege that the Class contains millions of members.

94.     Members of the Class may be notified of the pendency of this action by techniques and forms commonly used in class actions, such as by published notice, e-mail notice, website notice, first-class mail, or combinations thereof, or by other methods suitable to this Class and deemed necessary or appropriate by the Court.

95.     **Commonality**. Plaintiffs' claims raise significant common questions—*i.e.*, questions with answers not dependent upon the particular circumstances of class members, the answers to which are the same for everyone in the Class. These common questions include but are not limited to:

    (i.)     whether Roundup® can cause NHL in humans (general causation);

    (ii.)    whether Defendants were aware of the risks posed by use of or exposure to their Roundup® products;

    (iii.)   whether Defendants misrepresented, omitted, concealed, or failed to warn of or disclose material facts (facts a reasonable person would consider important) regarding the risks of use or exposure to Roundup®, including in their advertising and marketing;

    (iv.)   whether Defendants' practices related to the funding of research, marketing, labeling, and sale of Roundup® were unfair, deceptive, and/or unlawful;

  (v.)  whether Defendants' representations that Glyphosate is safe for human use created an express warranty on the Roundup® Products, and if so, whether Defendants breached that warranty; and

  (vi.)  whether Plaintiffs and Class Members are entitled to recovery of punitive damages (and in what amount).

Common questions regarding Defendant's Roundup® products, their knowledge regarding their risks, and their conduct in marketing Roundup®—including whether Defendants misrepresented, omitted, or concealed material facts regarding the Roundup® NHL risk—are inquiries salient to all claims. Resolving them on a class-wide basis would itself significantly advance the resolution or determination of all Class members' claims and save millions of dollars for the Class members and thousands of hours of judicial time and resources.

  96. **Typicality**. Plaintiffs' claims are typical of those held by the other members of the Class in that each of them was exposed to Roundup® and none has commenced an individual personal injury lawsuit against Defendants or retained counsel with the intention of filing an individual personal injury action against Defendants related to the facts alleged in this Complaint. Their claims are thus typical of those held by the Class.

  97. **Adequacy**. Plaintiffs and other class representatives will fairly, adequately, and vigorously protect the interests of the Class. Plaintiffs have retained trial counsel highly experienced in complex litigation, including complex class action litigation involving toxic exposures, and Plaintiffs intend to vigorously prosecute this action. Plaintiffs have no interests in this action that are adverse or antagonistic to the interests of the Class.

  98. **Predominance and Superiority**. The common questions of law and fact raised in this Complaint predominate over those affecting only individual Class members. Under these circumstances, class action litigation is superior to all other available means for the fair and efficient adjudication of common questions because these common questions are key to the advancement of the litigation by Class members.

  99. Further, individualized litigation would create the danger of inconsistent or contradictory results arising from an identical factual predicate.

100.    By contrast, litigation of common questions as a class action in a single, unitary proceeding will materially advance the disposition of the litigation because it will provide substantial economies of scale, allow comprehensive supervision of this issue raised herein by a single court, and presents no unusual management difficulties under the circumstances presented.

## VII.    CLAIMS FOR RELIEF

### COUNT I
### Strict Liability-Design Defect
### (On Behalf of Residents of the United States and its Territories)

101.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

102.    Plaintiffs and the Class bring this strict liability claim against Defendants for defective design.

103.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs and the Class, thereby placing Roundup® products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup® products to which the Class was exposed.

104.    At all times relevant to this litigation, Defendants' Roundup® products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs and the Class.

105.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout the United States, including Plaintiffs, without the substantial change in the condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

106.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design

and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

107.    Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

108.    At all times relevant to this action, Defendants knew or had reason to know that their Roundup® products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

109.    Therefore, at all times relevant to this litigation, Defendants' Roundup® products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

(i)    When placed in the stream of commerce, Defendants' Roundup® products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

(ii)    When placed in the stream of commerce, Defendants' Roundup® products were unreasonably dangerous in that they were hazardous and posed a grave risk of NHL when used in a reasonably anticipated manner.

(iii)    When placed in the stream of commerce, Defendants' Roundup® products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

110.    Defendants did not sufficiently test, investigate, or study their Roundup® products and, specifically, the active ingredient glyphosate alone and/or in combination with other Roundup® ingredients, including but not limited to surfactants.

111.    Exposure to Roundup® presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

112.    Defendants knew or should have known at the time of marketing their Roundup® products that exposure to Roundup® could cause cancers, including NHL.

113.    Defendants did not conduct adequate post-marketing surveillance of its Roundup® products.

114.    Defendants could have employed safer alternative designs and formulations.

115.    Plaintiffs and the Class were exposed to Defendants' Roundup® products without knowledge of their dangerous characteristics.

116.    At all times relevant to this litigation, Plaintiffs and the Class were exposed to Defendants' Roundup® products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

117.    Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup® before or at the time of exposure.

118.    The harm caused by Defendants' Roundup® products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Roundup® products were and are more dangerous than alternative products and Defendants could have designed Roundup® products to make them less dangerous. Indeed, at the time that Defendants designed Roundup® the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

119.    At the time Roundup® products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

120.    Therefore, as a result of the unreasonably dangerous condition of Roundup® products, Defendants are strictly liable to Plaintiffs and the Class.

121.    The defects in Defendants' Roundup® products were substantial and contributing factors in causing Plaintiffs and the Class to develop NHL or be put at increased risk of developing NHL, and, but for Defendants' misconduct and omissions, Plaintiffs and the Class would not have sustained these injuries.

122.     As a direct and proximate result of Defendants' placement of defective Roundup® products into the stream of commerce, Plaintiffs and the Class have suffered and will continue to suffer damages, injury in fact, and/or ascertainable loss in amounts to be determined. Plaintiffs and the Class therefore seek declaratory, injunctive, and equitable relief, as well as all relief available under law and equity.

123.     Additionally, Defendants' conduct, as described above, was oppressive, fraudulent, malicious, and conducted with willful and conscious disregard for the health and safety of users of the Roundup® products, including the Plaintiffs and the Class herein. Defendants had knowledge of the safety problems associated with Roundup® and suppressed this knowledge from the general public. Defendants also made conscious decisions not to modify or alter the Roundup® products. Defendants' conduct warrants an award of punitive damages.

124.     The determination of common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

### COUNT II
### Strict Liability-Failure to Warn
### (On Behalf of Residents of the United States and its Territories)

125.     Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

126.     Plaintiffs and the Class bring this strict liability claim against Defendants for failure to warn.

127.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup® products, which are defective and unreasonably dangerous to consumers, including Plaintiffs and the Class, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup® and specifically, the active ingredient glyphosate. These actions were under the ultimate control and supervision of Defendants.

128.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Roundup®

products, and in doing so, directly advertised or marketed the products to consumers and end users, including the Plaintiffs and the Class, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the use of Roundup®.

129.    At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiffs and the Class of the dangers associated with Roundup® use and exposure. Defendants, as a manufacturer, seller, or distributor of chemical herbicides, is held to the knowledge of experts in the field.

130.    At the time of manufacture, Defendants could have provided warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

131.    At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of this product and to those who would foreseeably use or be harmed by Roundup, including Plaintiffs and the Class.

132.    Despite the fact that Defendants knew or should have known that Roundup® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of Roundup® products and the carcinogenic characteristics of glyphosate when used with the other chemicals (including surfactants) in Roundup®, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and not known to end users and consumers, such as Plaintiffs and the Class.

133.    Defendants knew or should have known that these products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to Roundup® products. Defendants have

wrongfully concealed information concerning the dangerous nature of Roundup®, and further made false and/or misleading statements concerning the safety of Roundup®.

134.    At all times relevant to this litigation, Defendants' Roundup® products reached the intended consumers, handlers, and users or other persons coming into contact with these products in California and throughout the United States, including Plaintiffs and the Class, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

135.    At all times relevant to this litigation, Plaintiffs and the Class used Defendants' Roundup® products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

136.    Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of the exposure of Plaintiffs and the Class. Plaintiffs and the Class relied upon the skill, superior knowledge, and judgment of Defendants.

137.    Defendants knew or should have known that the minimal warnings disseminated with or accompanying the application of Roundup® products were inadequate, and they failed to communicate adequate information on the attendant dangers of using them and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

138.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed, including Plaintiffs and the Class, to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

139.   To this day, Defendants have failed to adequately and accurately warn of the true risks of Plaintiffs' and the Class's injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable human carcinogen. Indeed, Defendants continue to make the false and misleading assertions that Roundup® "can be used safely" and that "glyphosate does not cause cancer."[2]

140.   As a result of their inadequate warnings, Roundup® products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold or distributed by Defendants, and when Plaintiffs and the Class used or became exposed to them.

141.   Defendants are liable to Plaintiffs and the Class for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup® and glyphosate.

142.   The defects in these Roundup® products were substantial and contributing factors in causing Plaintiffs' and the Class's injuries and, but for Defendants' misconduct and omissions, Plaintiffs and the Class would not have sustained their injuries.

143.   Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products and application, Plaintiffs and the Class could have avoided the risk of developing injuries as alleged herein and Class members and/or the individuals or entities that employed Class members could have obtained alternative herbicides.

144.   As a direct and proximate result of Defendants' placement of defective Roundup® products into the stream of commerce and exposure of Plaintiffs and the Class to them, these Class members have suffered and will continue to suffer damages, injury in fact and/or ascertainable loss in an amount to be determined. Plaintiffs therefore seek declaratory, injunctive, and equitable relief, as well as all relief available under law and equity.

145.   Additionally, Defendants' conduct, as described above, was oppressive, fraudulent, malicious, and conducted with willful and conscious disregard for the health and safety of users of the

---

[2] Bayer Corp., "Glyphosate's Impact on Human Health and Safety," *available at* https://www.bayer.com/en/glyphosate/glyphosate-impact-on-human-health-and-safety (last accessed Mar. 25, 2023).

Roundup® products, including Plaintiffs and the Class herein. Defendants had knowledge of the safety problems associated with Roundup® and made conscious decisions not to warn or inform the public of the risks of Roundup® products. Defendants' conduct warrants an award of punitive damages.

146.    The determination of common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

**COUNT III**
**Negligence/Negligent Misrepresentation**
**(On Behalf of Residents of the United States and its Territories)**

147.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

148.    Defendants owed Plaintiffs and the Class a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup®, including a duty to assure that the product would not cause users an increased risk of suffering unreasonable, dangerous side effects or conditions.

149.    Defendants breached that duty. Defendants manufactured, marketed, advertised, and sold Roundup® as a "weed killer," but failed to disclose to users material information regarding the link between exposure to relevant doses and the likelihood of developing NHL after minimal usages and exposure per year, despite the fact that Defendants knew or should have known of Roundup®'s propensity to cause NHL.

150.    Defendants also failed to disclose, concealed, suppressed, and omitted material information concerning both Roundup® and the various studies that Defendants have cited to support their false claim that Roundup® does not cause NHL.

151.    Defendants intended that Plaintiffs and the Class rely upon their material misrepresentations and omissions.

152.    Defendants' negligent conduct, as alleged in this Complaint, exposed Plaintiffs to an increased risk of developing NHL from their use of Roundup®, rendering Defendants responsible for preventing or mitigating that risk of harm through payment for a program providing for medical diagnosis or other programmatic remedies, according to proof and as approved by the Court.

153.    Defendants' breach proximately caused Plaintiffs and the Class to suffer damages, injury in fact and/or ascertainable loss in amounts to be determined.

154.    The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

**COUNT IV**
**Breach of Express Warranty**
**(On Behalf of Residents of the United States and its Territories)**

155.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

156.    Defendants made several express warranties regarding Roundup®.

157.    These representations and promises became part of the basis of the bargain between the parties and created a collective "express warranty" that Roundup® would conform to Defendants' affirmations and promises.

158.    Defendants knew or should have known that Roundup® could cause NHL for those exposed to the product.

159.    Defendants have breached the express warranty.

160.    Defendants' conduct described in this Complaint constitutes a breach of express warranties under the following state statutes:

       (i)    Ala. Code § 7-2-313 *et seq.*;

       (ii)    Alaska Stat. § 45.02.313 *et seq.*;

       (iii)    Ariz. Rev. Stat. § 47-2313 *et seq.*;

       (iv)    Ark. Code § 4-2-313 *et seq.*;

       (v)    Cal. Com. Code § 2313 *et seq.*;

       (vi)    Colo. Rev. Stat. § 4-2-313 *et seq.*;

       (vii)    Conn. Gen. Stat. § 42a-2-313 *et seq.*;

       (viii)    6 Del. C. § 2-313 *et seq.*;

       (ix)    D.C. Code § 28:2-313 *et seq.*;

       (x)    Fla. Code § 672.313 *et seq.*;

(xi)        O.C.G.A. § 11-2-313 *et seq.*;

(xii)       Haw. Rev. Stat. § 490:2-313 *et seq.*;

(xiii)      Idaho Code § 28-2-313 *et seq.*;

(xiv)       810 Ill. Comp. Stat. 5/2-313 *et seq.*;

(xv)        Ind. Code § 26-1-2-313 *et seq.*;

(xvi)       Iowa Code § 554.2313 *et seq.*;

(xvii)      Kan. Stat. § 84-2-313 *et seq.*;

(xviii)     Ky. Rev. Stat. § 355.2-313 *et seq.*;

(xix)       La. Rev. Stat § 9:2800.53(6) *et seq.*;

(xx)        11 M.R.S.A. § 2-313 *et seq.*;

(xxi)       Md. Code Ann., Com. Law § 2-313 *et seq.*;

(xxii)      Mass. Code 106, § 2-313 *et seq.*;

(xxiii)     Mich. Comp. Laws 440.2313 *et seq.*;

(xxiv)      Minn. Stat. § 336.2-313 *et seq.*;

(xxv)       Miss. Code § 75-2-313 *et seq.*;

(xxvi)      Mo. Rev. Stat. § 400.2-313, *et seq.*;

(xxvii)     Mont. Code § 30-2-313 *et seq.*;

(xxviii)    Neb. U.C.C. § 2-313 *et seq.*;

(xxix)      Nev. Rev. Stat. § 104.2313 *et seq.*;

(xxx)       N.H. Rev. Stat. § 382-A:2-313 *et seq.*;

(xxxi)      N.J. Stat. § 12A:2-313 *et seq.*;

(xxxii)     N.M. Stat. § 55-2-313 *et seq.*;

(xxxiii)    N.Y. U.C.C. § 2-313 *et seq.*;

(xxxiv)     N.C. Gen. Stat. § 25-2-313 *et seq.*;

(xxxv)      N.D. Cent. Code § 41-02-30 *et seq.*;

(xxxvi)     Ohio Rev. Code § 1302.26 *et seq.*;

(xxxvii)    Okla. Stat. Tit. 12A, § 2-313 *et seq.*;

(xxxviii)   Or. Rev. Stat. § 72.3130 *et seq.*;

1        (xxxix)    13 Pa. Cons. Stat. § 2313 *et seq.*;

2        (xl)      R.I. Gen. Laws § 6A-2-313 *et seq.*;

3        (xli)     S.C. Code § 36-2-313 *et seq.*;

4        (xlii)    S.D. Codified Laws § 57A-2-313 *et seq.*;

5        (xliii)   Tenn. Code § 47-2-313 *et seq.*;

6        (xliv)   V.T.C.A. Bus. & C. § 2.313 *et seq.*;

7        (xlv)    Utah Code § 70A-2-313 *et seq.*;

8        (xlvi)   Vt. Stat. Tit. 9A, § 2-313 *et seq.*;

9        (xlvii)  Va. Code § 8.2-313 *et seq.*;

10       (xlviii)  Wash. Rev. Code § 62A.2-313 *et seq.*;

11       (xlix)   W. Va. Code § 46-2-313 *et seq.*;

12       (l)       Wis. Stat. § 402.313 *et seq.*; and

13       (li)      Wyo. Stat. § 34.1-2-313 *et seq.*

14     161.    Plaintiffs and the Class have complied with the warranty terms.

15     162.    As a direct and proximate result of the breach of the express warranty, Plaintiffs and the

16 Class suffered damages, injury in fact, and/or ascertainable loss in amounts to be determined.

17     163.    The determination of the common questions on a class-wide basis will advance the

18 resolution of this claim for individual Class members.

19                      **COUNT V**
             **Breach of Implied Warranty (Non-Privity)**

20  **(On Behalf of Residents of the Following States: Alaska; Arkansas; California; Colorado;**
      **Connecticut; Delaware; District of Columbia; Florida; Hawaii; Indiana; Kansas;**

21 **Louisiana; Maine; Maryland; Massachusetts; Michigan; Minnesota; Mississippi; Missouri;**
   **Montana; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; North Dakota;**

22    **Ohio; Oklahoma; Pennsylvania; Rhode Island; South Carolina; South Dakota; Texas;**
        **Utah; Vermont; Virginia; Washington; West Virginia; and Wyoming)**

23

24

25     164.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the

26 preceding paragraphs as if fully stated herein.

27     165.    Defendants are in the business of manufacturing, designing, supplying, marketing,

28 advertising, warranting, and selling Roundup®. Defendants impliedly warranted to Plaintiffs and the

Class that Roundup® was of a certain quality, free from defects, fit for its ordinary purpose of killing weeds, and fit for use without causing material harm to Plaintiffs and the Class.

166.    Roundup® was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendants, because it was defective and caused NHL. Prior to purchase, Plaintiffs and the Class could not have readily discovered that the product was not fit for its ordinary purpose.

167.    Roundup® was similarly unfit for its particular purpose and was unfit at the point of sale because it had the propensity to cause NHL.

168.    Defendants have failed to provide adequate remedies under its written express warranty, which has caused the express warranty to fail its essential purpose, thereby permitting remedies under implied warranties.

169.    Defendants have not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and conspicuously). Defendants knew or should have known that Roundup® increases the risk of NHL in those exposed to the product.

170.    Defendants' conduct described in this Complaint constitutes a breach of implied warranties under the following state statutes:

       (i)       Alaska Stat. §§ 45.02.314 and 45.02.315 *et seq.*;

       (ii)      Ark. Code Ann. §§ 4-2-314 and 4-2-315 *et seq.*;

       (iii)     Cal. Com. Code §§ 2314-2315 *et seq.* and Cal. Civ. Code § 1790 *et seq.*;

       (iv)     Colo. Rev. Stat. Ann. §§ 4-2-314 and 4-2-315 *et seq.*;

       (v)      Conn. Gen. Stat. §§ 42a-2-314 and 42a-2-315 *et seq.*;

       (vi)     Del. Code Ann. Tit. 6, §§ 2-314 and 2-315 *et seq.*;

       (vii)    D.C. Code §§ 28:2-314 and 28:2-315 *et seq.*;

       (viii)   Fla. Stat. Ann. §§ 672.314 and 672.315 *et seq.*;

       (ix)     Haw. Rev. Stat. §§ 490:2-314 and 490:2-315 *et seq.*;

       (x)      Ind. Code §§ 26-1-2-314 and 26-1-315 *et seq.*;

       (xi)     Kan. Stat. Ann. §§ 84-2-314 and 84-2-315 *et seq.*;

       (xii)    La. Civ. Code Ann. Art. 2520 *et seq.*;

(xiii)    Me. Rev. Stat. Ann. Tit. 11, §§ 2-314 and 2-315 *et seq.*;

(xiv)    Md. Code Ann., Com. Law §§ 2-314 and 2-315 *et seq.*;

(xv)     Mass. Gen. Laws ch. 106, §§ 2-314 and 2-315 *et seq.*;

(xvi)    Mich. Comp. Laws Ann. §§ 440.2314 and 440.2315 *et seq.*;

(xvii)   Minn. Stat. §§ 336.2-314 and 336.2-315 *et seq.*;

(xviii)  Miss. Code Ann. §§ 75-2-314 and 75-2-315 *et seq.*;

(xix)    Mo. Rev. Stat. §§ 400.2-314 and 400.2-315 *et seq.*;

(xx)     Mont. Code Ann. §§ 30-2-314 and 30-2-315 *et seq.*;

(xxi)    Neb. Rev. Stat. Ann. §§ 2-314 and 2-315 *et seq.*;

(xxii)   Nev. Rev. Stat. §§ 104.2314 and 104.2315 *et seq.*;

(xxiii)  N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2-315 *et seq.*;

(xxiv)   N.J. Stat. Ann. §§ 12A:2-314 and 12A-315 *et seq.*;

(xxv)    N.M. Stat. Ann. §§ 55-2-314 and 55-2-315 *et seq.*;

(xxvi)   N.D. Cent. Code §§ 41-02-31 and 41-02-32 *et seq.*;

(xxvii)  Ohio Rev. Code Ann. §§ 1302.27 and 1302.28 *et seq.*;

(xxviii) Okla. Stat. Tit. 12A, §§ 2-314 and 2-315 *et seq.*;

(xxix)   13 Pa. Stat. Ann. §§ 2314 and 2315 *et seq.*;

(xxx)    R.I. Gen. Laws §§ 6A-2-314 and 6A-2-315 *et seq.*;

(xxxi)   S.C. Code Ann. §§ 36-2-314 and 36-2-315 *et seq.*;

(xxxii)  S.D. Codified Laws §§ 57A-2-314 and 57A-2-315 *et seq.*;

(xxxiii) Tex. Bus. & Com. Code Ann. §§ 2.314 and 2.315 *et seq.*;

(xxxiv)  Utah Code Ann. §§ 70A-2-314 and 70A-2-315 *et seq.*;

(xxxv)   Vt. Stat. Ann. Tit. 9A, §§ 2-314 and 2-315 *et seq.*;

(xxxvi)  Va. Code Ann. §§ 8.2-314 and 8.2-315 *et seq.*;

(xxxvii) Wash. Rev. Code §§ 62A.2-314 and 62A.2-315 *et seq.*;

(xxxviii) W. Va. Code §§ 46-2-314 and 46-2-315 *et seq.*; and

(xxxix)  Wyo. Stat. Ann. §§ 34.1-2-314 and 34.1-2-315 *et seq.*

171.    Constructive notice was duly given to Defendants of the breaches of these warranties, and Defendants have failed to cure them.

172.    As a direct and proximate result of the breaches of these warranties, Plaintiffs and the Class suffered damages, injury in fact, and/or ascertainable loss in amounts to be determined.

173.    The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

<u>**COUNT VI**</u>
**<u>Breach of Implied Warranty (Privity)</u>**
**<u>(On Behalf of Residents of the Following States: Alabama; Arizona; Georgia; Idaho;</u>**
**<u>Illinois; Iowa; Kentucky; New York; North Carolina; Oregon; Tennessee; and Wisconsin)</u>**

174.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

175.    Defendants are in the business of manufacturing, designing, supplying, marketing, advertising, warranting, and selling Roundup®, which has been used as a weed killer. Defendants impliedly warranted to Plaintiffs and the Class (and/or to their employers) that Roundup® was of a certain quality, was free from defects, and was fit for its ordinary purpose.

176.    Roundup® was unfit for its ordinary use and was not of merchantable quality, as warranted by Defendants, because it was defective, and studies show that it increases the risk of NHL. Prior to purchase, Plaintiffs and the Class could not have readily discovered that the product was not fit for its ordinary purpose and would potentially cause NHL.

177.    Roundup® was similarly unfit for its particular purpose.

178.    Defendants have not sufficiently disclaimed the implied warranty of merchantability (specifically and conspicuously) or the implied warranty of fitness (in writing and conspicuously). Further, the purported limitations in the warranty, including limiting the "exclusive remedy" to a refund or replacement, are procedurally and substantively unconscionable.

179.    Defendants were and are in privity with each Class member by law and/or by fact. First, Plaintiffs and the Class members have had sufficient direct dealings with Defendants and/or their authorized dealers, franchisees, representatives, and agents to establish privity of contract. Alternatively, Plaintiffs and Class members are intended third-party beneficiaries of contracts, including express

warranties, between Defendants and its dealers, franchisees, representatives and agents. Defendants' advertisements were aimed at Plaintiffs and Class members, and Defendants' warranties were expressly written for the benefit of Plaintiffs and Class members as end users of Roundup®. Defendants' authorized dealers, franchisees, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of Roundup® and have no rights under the warranty agreements provided by Defendants; these intermediary entities made no changes to Defendants' product, nor did they make any additions to the warranties issued by Defendants. Further, Defendants are estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.

180.    Defendants' conduct described in this Complaint constitutes a breach of implied warranties under the following state statutes:

(i)      Ala. Code §§ 7-2-314, 7-2-315 and 7-2-318 i;

(ii)     Ariz. Rev. Stat. Ann. §§ 47-2314, 47-2315 and 47-2318 *et seq.*;

(iii)    Ga. Code Ann. §§ 11-2-314, 11-2-315 and 11-2-318 *et seq.*;

(iv)     Idaho Code Ann. §§ 28:2-314, 28:2-315 and 28:2-318 *et seq.*;

(v)      810 Ill. Comp. Stat. 5/2-314, 5/2-315 and 5/2-318 *et seq.*;

(vi)     Iowa Code §§ 554.2314, 554.2315 and 554.2318 *et seq.*;

(vii)    Ky. Rev. Stat. Ann. §§ 355.2-314, 355.2-315 and 355.2-318 *et seq.*;

(viii)   N.Y. U.C.C. Law §§ 2-314, 2-315 and 2-318 *et seq.*;

(ix)     N.C. Gen. Stat. §§ 25-2-314, 25-2-315 and 25-2-318 *et seq.*;

(x)      Ore. Rev. Stat. §§ 72.3140, 72.3150 and 72.3180 *et seq.*;

(xi)     Tenn. Code Ann. §§ 47-2-314, 47-2-315 and 47-2-318 *et seq.*; and

(xii)    Wis. Stat. §§ 402.314, 402.315 and 402.318 *et seq.*

181.    Actual and/or constructive notice was duly given to Defendants of the breaches of these warranties, and Defendants have failed to cure them.

182.    As a direct and proximate result of the breaches of these warranties, Plaintiffs and the Class have suffered damages, injury in fact, and/or ascertainable loss in amounts to be determined.

183.    The determination of common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

**COUNT VII**
**Violation of State Consumer Laws**
**(On Behalf of Residents of the Following States: Alaska; Arizona; Arkansas; California; Colorado; Connecticut; Delaware; District of Columbia; Florida; Hawaii; Idaho; Illinois; Indiana; Iowa; Kansas; Maine; Maryland; Massachusetts; Michigan; Minnesota; Missouri; Nebraska; Nevada; New Hampshire; New Jersey; New Mexico; New York; North Carolina; North Dakota; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island; South Dakota; Texas; Utah; Vermont; Virginia; Washington; West Virginia; Wisconsin; and Wyoming)**

184.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

185.    Defendants market and sell goods, including Roundup®, to consumers throughout the United States and its Territories, including to Plaintiffs and the Class. Defendants' acts and omissions regarding Roundup® affect trade and commerce across all the United States and its Territories.

186.    Plaintiffs and statewide Class members are consumers who purchased and used Roundup® primarily for personal, family and/or household purposes.

187.    Defendants have violated state consumer protection laws by engaging in unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful acts or practices, including without limitation, by defective design and manufacture of Roundup® as well as misleading marketing, advertising, selling, and warranting of Roundup® to consumers. In connection with these sales, Defendants omitted material information about Roundup® that they were legally obligated to disclose. Defendants never informed Plaintiffs or Class members, at the point of sale or otherwise, that Roundup® was linked to an increased risk of developing NHL and failed to disclose this information in a timely manner.

188.    Among other things, Defendants made numerous deceptive statements regarding Roundup®.

189.    Through their conduct, Defendants have violated the following state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices:

(i)    The Alaska Unfair Trade Practices and Consumer Protection Act, Alaska Stat. §§ 45.50.471 *et seq.*;

(ii)    The Arizona Consumer Fraud Act, A.R.S. § 44-1522 *et seq.*;

(iii)    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2) *et seq.*;

(iv)    The California Unfair Competition Law, Cal. Bus. & Prof. Code, § 17200 *et seq.*;

(v)    The Colorado Consumer Protection Act, Col. Rev. Stat. Ann. §§ 6-1-105(1)(b), (c), (e) and (g) *et seq.*;

(vi)    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42110(b) *et seq.*;

(vii)    The Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513 *et seq.*;

(viii)    The District of Columbia Consumer Protection Act, D.C. Code §§ 28-3904(a), (d), (e), (f) and (r) *et seq.*;

(ix)    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1) *et seq.*;

(x)    The Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A3(a)(5), (7) and (12) *et seq.* and the Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. § 480-2(a) *et seq.*;

(xi)    The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18) *et seq.* and Idaho Code § 48-603C *et seq.*;

(xii)    The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2 *et seq.* and the Illinois Uniform Deceptive Trades Practices Act, 815 Ill. Stat. § 510/2(a)(5), (7) and (12) *et seq.*;

(xiii)    The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2) *et seq.*;

(xiv)    The Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5 *et seq.*;

(xv)    The Kansas Consumer Protection Act, Kan. Stat. §§ 50-626(a) and (b)(1)(A)(D) and (b)(3) *et seq.*;

(xvi)     The Maine Uniform Deceptive Trade Practices Act, 10 M.R. S.A. §§ 1212(1)(E) and (G) *et seq.* and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207 *et seq.*;

(xvii)    The Maryland Consumer Protection Act, Md. Code Commercial Law, § 13 - 301(1) and (2)(i), and (iv) and (9)(i) *et seq.*;

(xviii)   The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a) *et seq.*;

(xix)     The Michigan Consumer Protection Act, M.C.P.L.A. § 445.903(1)(c)(e), (s) and (cc) *et seq.*;

(xx)      The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13) *et seq.*, the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.3 1, subd. 3(a) *et seq.*;

(xxi)     The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1) *et seq.*;

(xxii)    The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302(a)(5) and (7) *et seq.*;

(xxiii)   The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7) *et seq.*;

(xxiv)    The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(v) and (vii) *et seq.*;

(xxv)     The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2 *et seq.*;

(xxvi)    The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7) and (14) and 57-12-3 *et seq.*;

(xxvii)   New York Business Law, N.Y. Gen. Bus. Law § 349(a) *et seq.*;

(xxviii)  The North Carolina Unfair Trade Practices Act, N.C.G.S.A. § 75-1.1(a) *et seq.*;

(xxix)    The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02 *et seq.*;

(xxx)    The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A), (B)(1) and (2) *et seq.*[3];

(xxxi)    The Oklahoma Consumer Protection Act, 15 Okl. Stat. Ann. § 753(5), (7) and (20) *et seq.*;

(xxxii)    The Oregon Unfair Trade Practices Act, Or. Rev. Stat. §§ 646.608(1)(e)(g) and (u) *et seq.*;

(xxxiii)    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3 *et seq.*;

(xxxiv)    The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv) *et seq.*;

(xxxv)    The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1) *et seq.*;

(xxxvi)    The Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus. & C. § 17.46(a), (b)(5) and (7) *et seq.*;

(xxxvii)    The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and (2)(a) and (b) *et seq.*;

(xxxviii)    The Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a) *et seq.*;

(xxxix)    The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14) *et seq.*;

---

[3]    Pursuant to Ohio Rev. Code Ann. § 1345.09(B), Defendants' alleged acts must have been previously declared to be deceptive or unconscionable under Ohio Rev. Code Ann. §§ 1345.02 or 1345.03. Defendants systematically made misrepresentations and material omissions regarding Roundup®. Ohio courts have declared such acts to be deceptive or unconscionable. *See, e.g.*, *Arales v. Furs by Weiss, Inc.*, No. 81603, 2003 WL 21469131, at *1-4 (Ohio Ct. App. June 26, 2003) (retailer's omission to consumer was unfair or deceptive); *Lump v. Best Door & Window, Inc.*, Nos. 8-01-09, 8-01-10, 2002 WL 462863, at *4-5 (Ohio Ct. App. Mar. 27, 2002) (failure to perform obligations to consumers in a timely and competent manner is a deceptive and unconscionable).

(xl)      The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020 *et seq.*;

(xli)     The West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A-6-104 *et seq.*;

(xlii)    The Wisconsin Deceptive Trade Practices Act, W.S.A. § 100.20(1) *et seq.*; and

(xliii)   The Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii) and (xv) *et seq.*

190.   Plaintiffs and the Class bring this action on behalf of themselves and all similarly situated persons for the equitable, declaratory, and injunctive relief requested; to promote the public interests in the provision of truthful, non-deceptive information to allow consumers to make informed purchasing decisions; and to protect Plaintiffs, the Class, and the public from Defendants' unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and/or unlawful practices. Defendants' wrongful conduct has had a widespread impact on the public at large and caused serious injuries to Plaintiffs and the Class members.

191.   Defendants have long had notice of the underlying allegations, claims and demands in this Complaint, including from internal audits, field testing, online complaints, and direct complaints regarding Roundup®.

192.   As a direct and proximate result of Defendants' unfair methods of competition and unfair, deceptive, fraudulent, unconscionable, and/or unlawful acts or practices, Plaintiffs and the Class have suffered ascertainable losses and injuries in amounts to be determined.

193.   The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

### COUNT VIII
### Violation of State False Advertising Laws
### (On Behalf of Residents of Those States and Territories
### with False Advertising Law Claims)

194.   Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

195.    Plaintiffs and the Class bring this claim pursuant to applicable false advertising laws which prohibit deceptive, misleading, and/or false advertising.

196.    Defendants violated false advertising laws by advertising and representing—on product labels, advertisements, and warranties—that Roundup® was safe when in fact it was not. As alleged, these representations were false, misleading, and likely to deceive Plaintiffs, members of the Class, those who employed Plaintiffs and Class members and purchased Roundup® for their use, and other reasonable consumers.

197.    In connection with these sales, Defendants also omitted material information about Roundup® that they were legally obligated to disclose. Defendants never informed Plaintiffs or the Class, at the point of sale or otherwise, that Roundup® could cause NHL.

198.    At the time of sale, Defendants knew, or by the exercise of reasonable care should have known—given their internal data—that their representations and omissions were false and misleading.

199.    Defendants made these representations and omissions for the purpose of inducing, and Defendants did induce, Plaintiffs and members of the Class, and/or the individuals or entities that employed Plaintiffs and members of the Class, and/or other purchasers of Roundup®.

200.    Plaintiffs and the Class reviewed and reasonably relied on Defendants' representations and omissions regarding Roundup® and incurred damages as a direct and proximate result.

201.    As a direct and proximate result of Defendants' violation of false advertising laws, Plaintiffs and the Class have suffered ascertainable losses and injuries in amounts to be determined.

202.    The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

### COUNT IX
### Fraudulent Concealment
### (On Behalf of Residents of the United States and its Territories)

203.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

204.    Defendants knowingly and intentionally concealed material facts regarding Roundup®.

205.    Defendants knew they were omitting material facts at the time they sold Roundup® to Plaintiffs and the Class and at a time they had a duty to disclose these facts.

206.    In omitting these facts, Defendants intended to defraud Plaintiffs and the Class and/or the individuals/entities that employed Plaintiffs and the Class and intended for them to rely upon Defendants' omissions to purchase more Roundup®.

207.    Plaintiffs and the Class reviewed and reasonably relied on Defendants' representations and omissions regarding Roundup® and incurred damages as a direct and proximate result, in amounts to be determined. Any limitation on economic loss is precluded by Defendants' fraudulent misrepresentations.

208.    Plaintiffs and the Class, in reasonable reliance on those statements made by Defendants, incurred out of pocket costs.

209.    Plaintiffs and the Class have suffered ascertainable losses and injuries in amounts to be determined.

210.    The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class Members.

**COUNT X**
**Claim for Declaratory Relief**
**(On Behalf of Residents of the United States and its Territories)**

211.    Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

212.    Defendants have acted and refused to act with respect to their misrepresentations and omissions concerning the safety of Roundup® in a manner that has affected all Class members, and the declaratory, injunctive and equitable relief sought herein will provide relief to all members of the Class.

213.    An actual case and controversy exists as between Plaintiffs and Defendants as to:

(i)      Whether Roundup® is unfit for its ordinary purpose;

(ii)     Whether Defendants marketed Roundup® but omitted material health information regarding its use;

(iii)     Whether Defendants' marketing of Roundup® was false, deceptive, and/or misleading;

(iv)     Whether Roundup is carcinogenic, genotoxic and/or linked to NHL;

(v)      Whether and when Defendants discovered that Roundup® was carcinogenic, genotoxic and/or linked to NHL;

(vi)     Whether Defendants had a duty to disclose the fact that Roundup® was carcinogenic, genotoxic and/or linked to NHL;

(vii)    Whether Defendants engaged in fraudulent, unfair, or deceptive practices;

(viii)   Whether Defendants misrepresented, omitted, concealed or failed to disclose material facts regarding the risks of use or exposure to Roundup®; and

(ix)     Whether Defendants are financially responsible for providing corrective notice to the Class regarding Roundup®.

214.     The requested declaratory relief set forth herein will produce answers to the common questions that will resolve a controversy that lies at the heart of this litigation and will allow Plaintiffs and the Class to obtain relief that directly redresses the injuries suffered.

## COUNT XI
## Claim for Medical Monitoring Program
## (On Behalf of Residents of the United States and its Territories)

215.     Plaintiffs and the Class incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

216.     Defendants' conduct, as alleged herein, placed Plaintiffs and the Class at increased risk of contracting NHL, through exposure to Roundup®. Under principles of common law tort and as a matter of equity, Defendants should pay for the costs of medical screening, diagnostic and/or surveillance programs and services to be provided to Plaintiffs and the Class, to prevent or mitigate the injury otherwise resulting from Roundup® exposure, as appropriate and according to proof, through an appropriate program approved by the Court and administered under its ongoing supervision.

217.     The determination of the common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

1.      An order certifying an appropriate Class and Subclasses for the determination of common questions of law and fact regarding Defendants' product, knowledge, conduct, and duty, and to provide programmatic relief as alleged and requested herein; and designating Plaintiffs and their undersigned counsel as Class and Subclass Representatives and counsel as appropriate;

2.      Compensatory damages, and, exemplary, punitive, and statutory penalties and damages as allowed by law, including interest, in amounts to be proven, for Subclass 1;

3.      Compensatory, exemplary and punitive damages, statutory penalties, and other monetary relief, including interest, as allowed by law, in amounts to be proven, for Plaintiffs and the Class, including a medical-monitoring program and other diagnostic assistance;

4.      Appropriate declaratory, equitable, medical monitoring, and/or injunctive relief according to proof;

5.      An award of reasonable attorneys' fees and costs incurred in this action; and

6.      Such other and further relief as the Court deems just and proper.

## VIII.   **JURY DEMAND**

Plaintiffs and the Class hereby demand a trial by jury on all matters so properly triable.

Dated: September 26, 2023

Respectfully Submitted,

**JOSEPH SAVERI LAW FIRM, LLP**

By:  */s/ Joseph R. Saveri*
            Joseph R. Saveri

Joseph R. Saveri (SBN 130064)
Christopher K. L. Young (SBN 318371)
Itak K. Moradi (SBN 310537)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
jsaveri@saverilawfirm.com
cyoung@saverilawfirm.com
imoradi@saverilawfirm.com

Robert L. Lieff (SBN 37568)
P.O. Box A
Rutherford, CA 94573
Telephone: (415) 250-4800
rlieff@lieff.com

*Attorneys for Plaintiffs*